UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAUREN F. MOORE,

                    Plaintiff,

        v.

JOHNSON & JOHNSON, VANESSA
BROADHURST, and HOWARD REID,

                    Defendants.

No. 24-cv-6405

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Lauren F. Moore ("Moore" or "Plaintiff"), by her undersigned attorneys, Reavis Page Jump LLP, for her Complaint against defendants Johnson & Johnson (also referred to herein, together with its subsidiaries, as "J&J" or the "Company"), Vanessa Broadhurst ("Broadhurst"), and Howard Reid ("Reid") (collectively, the "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1.    Moore brings this action against the Defendants for unlawful discrimination, harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* (the "NYCHRL").

2.    This action arises from the overt discrimination, hostile work environment, and retaliation directed against Moore by the Defendants. Moore was a highly successful and honored senior executive at J&J in the field of corporate social responsibility and global social impact. Her tangible accomplishments for, massive contributions to, and effective leadership at J&J had all been consistently recognized by the Company since she started working there in 2015. That

1

recognition by J&J, and Moore's status within the Company, all changed once Broadhurst was installed as the new leader of Moore's corporate group seven years later in 2022.

3.      Broadhurst, who is Black, immediately embarked – together with the ensuing participation and condonation of Defendant Reid – on a campaign to target, discredit, and diminish Moore, who is white.  Broadhurst subjected Moore to two continuous years of explicit and wrongful harassment, disparagement, hostile work environment, unwarranted demotions, compensation reductions, bonus and stock denial, discrimination, retaliation, abrupt termination, and subsequent punitive financial penalties, solely on the basis of Moore's race-color and sex-gender.

4.      Moore's story is one of diversity, equity, and inclusion efforts gone awry, being implemented abruptly, unfairly and in a brazenly illegal manner, where individuals, herself included, are reduced to just the color of their skin and their sex-gender.  It is one in which knowledge, merit, and experience are improperly overshadowed by such characteristics, and in which discriminatory decision-making, compounded here by Broadhurst's personal racial animus toward Moore, ignores the reality of individuals' and in particular Moore's expertise, experience, actual work, and commended results, as well as the Company's policies, procedures, and commitments to her.

5.      In Broadhurst and J&J's ostensible pursuit of a more diverse workplace – of which Moore is a strong proponent, and which she has spent a great deal of her approximately 40-year career promoting and demonstrably expanding – Moore was harshly, unfairly, offensively, and illegally discredited, blocked from opportunities, undermined, and treated differently – certainly less well – by Broadhurst, and by other J&J representatives who followed along with Broadhurst, all merely for being a white female.

6.    In early 2023, Broadhurst even told Moore, openly and explicitly during a Company meeting and in the presence of six others forming Broadhurst's leadership team, that there were "too many white women" on that team.  Given that Moore was one of three of those "too many white women," that was a directly racist and misogynistic criticism of her.

7.    Broadhurst's unlawfully motivated mistreatment of Moore had begun essentially immediately upon Broadhurst's assuming leadership of Moore's group.  After becoming Moore's supervisor in early 2022, Broadhurst took a number of actions directly against Moore without first even working with her, effectively to prevent Moore – and which did prevent Moore – from remaining with the Company or being considered for other senior J&J roles or opportunities. Broadhurst's actions were based on grossly improper considerations of race-color and sex-gender, and were completely divorced from and unrelated to Moore's expertise, experience, and performance at the Company.

8.    Broadhurst ensured the demise of Moore's career at J&J, side-stepping J&J protocol and policies, ignoring financial and other commitments made by the Company to Moore, showing favoritism to her own allies based on improper considerations of race and gender, and simply "calling up" Moore's successor, *i.e.*, Defendant Reid, like he was waiting for the "tap" – something he expected and shared during a Company meeting with Moore and her team, and which was borne out by the events themselves.

9.    Promptly after Moore formally reported to the Company in June 2023 Broadhurst's "too many white women" comment and Moore's honest concerns of wrongful treatment, inappropriate demotion, compensation reduction, discrimination, retaliation, and hostile work environment based on race and gender, to the Company's senior Human Resources ("HR") leaders – both orally and in writing, and believing that what had happened to her and that what had been

said were deeply wrong, both to her and to her group, as well as dangerous for the Company itself – Moore suffered immediate, serious and sustained retaliation.

10.    Moore was substantially demoted for a second time, received serious and permanent pay reductions, had her job responsibilities stripped from her, had her job title and level dramatically reduced (which automatically resulted at J&J in diminished duties and managerial access, as well as diminished compensation), and was later abruptly terminated from the Company entirely, with very little notice, and all in the most deliberate, open, discriminatory, retaliatory, vindictive and humiliating way, and literally just days away from the vesting of her valuable J&J stock that Moore had worked so hard for the better part of a decade to earn, just weeks away from receiving her annual bonus, and just months away from her retirement from the Company and the retirement payments and benefits that the J&J's retirement plan would have provided to her and her family.

11.    These adverse employment actions occurred despite Moore's strong written track record of performance, her formal annual performance reviews ranking her in the highest J&J categories, her 40 years of experience and expertise in her field, her vast network of valuable professional relationships benefiting J&J, her high compensation and rewards from the Company, and her having been earlier advised by J&J senior management, as a practical matter, that her role would be secure.

12.    Notably, once Moore began participating in the J&J "investigation" process, which had been triggered by Moore's June 2023 written complaint of racism and sexism at the Company, the hostility toward her dramatically increased even further.  Moore was also, in effect, punished for making use of the Company's procedures.  The investigation quickly turned against Moore, despite clear evidence of the racism and sexism at J&J against her.

13.    Moore's treatment at J&J sends an unfortunate message internally at J&J of what happens when its employees make honest, good-faith complaints, and in particular complaints about racism or sexism, or complaints against the actions of Broadhurst, who is apparently on such a groomed track to be the possible next or future CEO of the Company that she effectively operates with impunity.  Termination and career derailment are the result of such complaints.

14.    Then, after Moore was terminated in January 2024, and adding financial insult to unlawful injury, J&J punitively and retaliatorily canceled Moore's earned performance bonus for year 2023 (despite having previously confirmed to her in writing the Company's approval of that bonus), denied her long-term incentive compensation, and stripped Moore of the chance to earn her full retirement benefits.

15.    By this action, Moore seeks justice for herself and ultimately for others within J&J, a company known for health and wellness, but which, on the inside and at the senior executive level, has demonstrated to Moore anything but.

## THE PARTIES

16.    Plaintiff Lauren F. Moore is an individual who was formerly employed by Defendant Johnson & Johnson.  She resides in New York, New York.

17.    Upon information and belief, Johnson & Johnson is a company incorporated in the State of New Jersey, having its principal place of business in New Brunswick, New Jersey.  At all relevant times, Johnson & Johnson had more than 500 employees, was an employer of Moore, and was engaged in an industry affecting commerce, as defined under applicable law.

18.    Upon information and belief, Defendant Broadhurst is an individual who resides in the State of New Jersey and who is Executive Vice President, Global Corporate Affairs, at Johnson & Johnson.  Broadhurst supervised Moore's work for J&J and had ultimate authority regarding

the terms and conditions of Moore's employment.

19.      Upon information and belief, Defendant Reid is an individual who resides in the State of New Jersey and who is now Global Head, Global Health Equity and Social Impact, at Johnson & Johnson.  Reid supervised Moore's work for J&J and had authority regarding the terms and conditions of Moore's employment.

## JURISDICTION AND VENUE

20.      Moore seeks damages sustained as a result of Defendants' unlawful conduct in an amount to be proven at trial, but believed to be approximately $9.5 million – comprising, among other things, back pay damages, the value of lost J&J stock, the value of lost J&J bonuses, the value of lost J&J benefits, the value of lost J&J retirement pay and benefits, front pay damages, and emotional distress damages – as well as punitive damages, attorneys' fees, and interest, as available under applicable law.

21.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, in that it involves a federal question under the employment discrimination laws of the United States, namely, 42 U.S.C. § 2000e *et seq*.  This Court has supplemental jurisdiction over Moore's state and local statutory claims, pursuant to 28 U.S.C. § 1367(a), because such claims arise from the same or closely related conduct of the Defendants.

22.      This Court also has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(3), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

23.      This Court has personal jurisdiction over the Defendants because the Defendants intentionally acted in such a way as to cause injury to Moore in the State of New York.

24.     Venue is proper in this district by virtue of 42 U.S.C. § 2000e, which provides in relevant part that venue may be in any district court in the state where the discriminatory acts took place, *see* 42 U.S.C. § 2000e-5(f)(3); and by virtue of 28 U.S.C. § 1391(b) and (c), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTS COMMON TO ALL CLAIMS

### A.     Moore's Pre-J&J Career and Her Substantial Accomplishments at J&J

25.     Moore is a 61-year-old, Caucasian female.

26.     Over the course of nearly 40 years, Moore has had a successful, rewarding, upwardly mobile career working for nonprofits and then in the corporate social responsibility and/or philanthropic divisions of Fortune 500 companies.  Her work has positively impacted millions of people, both domestically and globally.

27.     Following graduation from the University of Washington, Moore began working in the nonprofit field, including for the American Heart Association;  the Seattle Chamber Music Festival, where she rose to Executive Director;  and Legal Aid Washington, where she became Executive Director.  Moore's track record of effective leadership started early in her career.

28.     In 2000, as high-profile companies were increasingly integrating social accountability into their corporate leadership and practices, Moore joined Starbucks as part of its first Corporate Social Responsibility team.  Consistent with her prior trajectories, she moved up the ranks within Starbucks, and became leader of the Starbucks Corporate Giving team, as Director, and then led the Starbucks Foundation, as Executive Director, Community Affairs and Employee Engagement.  Moore and her team developed, among other things, programs to provide social development grants to support communities where the company's products were sourced,

such as clean water projects, and humanitarian initiatives in regions well beyond those on which the company relied.

29.    After nearly ten years with Starbucks, Moore joined eBay in 2009 to lead its Social Impact team.    At eBay, she led the eBay Foundation, Corporate Giving, and Employee Engagement, for six years.    That role was also focused on community outreach and volunteerism, as well as on a broad array of grant-making programs involving social and environmental change globally, making use of eBay's vast networks and resources.

30.    Corporate social responsibility is a specialized field, and with her over three decades of experience ultimately at the highest levels, Moore had developed second-to-none knowledge and expertise, as well as a vast network of contacts and resources, both domestic and international.    She had become one of the foremost practitioners in her field, and was widely respected for her efforts and successes in creating and implementing innovative corporate strategies with concrete domestic and global impact.

31.    Indeed, Moore's strong performance at Starbucks and eBay, where she had earned an excellent reputation for professionalism, respect for others, and effective leadership on strategy and team management, did not go unnoticed.    Her name was eventually shared with a hiring supervisor at J&J, which was starting a search for a leader for its philanthropy and social impact team.    A recruiter for J&J reached out to her.

32.    Following a period of heavy recruitment, and after being offered and then accepting the position, Moore joined J&J in October 2015, with a mandate to help drive its strategy and implementation of corporate responsibility initiatives throughout the world.    Moore relocated for the job and moved with her family from Palo Alto, California, to New York City.    She hit the ground running as J&J's Vice President, Corporate Contributions.    She worked successfully and

evolved the team's strategy, after which the team name was changed to Global Community Impact ("GCI").

33.    When Moore joined J&J, the team was called the "Corporate Contributions" team, and it handled a lot of charitable giving in a lot of different focus areas.  That approach has the disadvantage of lacking any real alignment toward demonstrable impact and results.  One key focus for Moore, both throughout her career in general and which J&J espoused and asked her to help lead, has been identifying more targeted strategies and aligning corporate work and resources to achieve concrete, demonstrable goals.

34.    In light of this, under Moore's leadership at J&J, she proposed to senior Company executives that J&J concentrate many of its efforts on supporting "frontline health workers," because if one lacks access to a primary health care physician (such as in under-resourced settings and low-income countries), then primary care often comes instead from a nurse, community health worker, or midwife.  By helping to address the challenges facing those frontline health workers, and supporting them through J&J programs, health care can be improved for everyone.

35.    Moore's proposal was approved, along with her planned leadership in developing and implementing the new approach.  This approach was not focused on charitable giving *per se*, but on creating long-term partnerships with NGOs and stakeholders with similar interests, including working with governments. With the development of this new J&J strategy, Moore had Company support, led the team, and brought in great talent with important expertise in areas like digital health, measurement and evaluation, operations, foundation management, impact investment, and stakeholder engagement.

36.    In short, and as confirmed in her J&J written annual Performance Reviews, Moore effectively led and was integral in "modernizing" J&J's social impact efforts.

37.    She was also instrumental in moving to have the Company communicate more effectively externally about J&J's work, to help the Company build a more positive reputation in this area. It could be said that Moore was the face of J&J's global social impact work, including as recently as being in the news in late 2023 in connection with a major J&J public health initiative that she led and that she and her team developed for Kenya, for which she was selected to be J&J's leading senior representative, including being the face of J&J and leading Company meetings and high profile events in Kenya. The Company trumpeted the success of this initiative led by Moore.

38.    Indeed, at an important public event in Kenya in late September 2023, called the "Community Health Promoters Programme," Moore presented a speech on behalf of J&J, following remarks by the President of Kenya, William Ruto, who acknowledged and celebrated the successful efforts of Moore and her J&J team on frontline health worker issues.

39.    Moore excelled as a senior leader at J&J, with a litany of impressive and longstanding accomplishments and demonstrated leadership successes at the Company. Some of her key specific achievements, her practical and strategic leadership initiatives, and her other performance highlights at J&J, through Broadhurst becoming her Supervisor, are noted in the following paragraphs.

40.    In 2015/2016, Moore led and implemented a process to create a new focus area for J&J's philanthropic investments and, importantly, a strategy to define and follow up on the impact of the Company's philanthropic work. She also led an effort to define a new social impact strategy, along with a re-designed organization to support that new addition to J&J's philanthropic work.

41.    In or around early 2016, Moore discovered that no one had been looking after the business-management side of the J&J Foundation. Perhaps the most pressing and significant issues were that the Foundation had not filed tax returns for several years and had received at least

one IRS letter stating that if certain delinquent and missing tax returns were not filed immediately, the Foundation's 501(c)(3) non-profit status would be revoked. That would have been a massive reputational blow for the Company. Moore worked closely with the J&J Tax and Legal teams to rectify the issues and help get the Foundation's books and management in order, and she had ongoing support from those teams going forward with respect to leading on Foundation issues.

42.     In 2016, Moore led the effort to launch the new strategy focused on frontline health workers. She spearheaded the creation of a Company-wide commitment to these workers, for training and education, mental health and resilience, and leadership capabilities. The new strategy was supported by the Johnson & Johnson Foundation, as well as by the Company itself. Notably, this is still J&J's strategy today, and it has grown and increased, particularly due to the global COVID-19 pandemic, during which a focus on supporting health workers became more critical and understood. For example, on her recent trip to Kenya in September 2023, Moore could see how this new strategy of working with key stakeholders, providing resources, and empowering frontline health workers, has already impacted and helped millions of people.

43.     In 2016/2017, Moore led and implemented J&J's first Impact Investment fund – a $50-million-dollar fund now called Johnson & Johnson Impact Ventures ("JJIV"). JJIV partners with entrepreneurs to advance health equity for underserved patients around the world. Concretely, JJIV invests in social entrepreneurs whose businesses are tackling some of the same health challenges as J&J's social investment (philanthropic) programs, including access to healthcare in underserved communities, supporting health workers with resources and education, and so forth. JJIV has reached over 2.8 million patients and positively impacted them through the healthcare services and products of JJIV's portfolio companies, in addition to the millions more

people reached indirectly through JJIV's support of healthcare systems and healthcare professionals.

44.    During the global pandemic in 2020, J&J agreed to increase its financial commitment to health workers, and Moore led the effort to create and launch J&J's Center for Health Worker Innovation ("CHWI").  In 2020, this included an increase in programmatic work to support health workers around the world, and Moore secured an incremental $50 million commitment to health workers at this critical time.

45.    In addition under Moore's leadership, CHWI secured a $250 million commitment, over 10 years, to support one million nurses, midwives, and community health workers, and targeted reaching 100 million people by 2030.  This Sustainable Development Goal was, however, reached in 2023, seven years early.

46.    Until Moore's wrongful termination in 2024, J&J's commitment to health workers continued under her leadership;  in fact, it continues to this day and has become a signature program for the Company.

47.    In early 2020, when Moore and the Company launched the J&J CHWI Platform for frontline health care workers, it became a huge reputation-driver for J&J.  Indeed, in a survey about what the general public knew about J&J during the pandemic, the first thing was that J&J was working on a COVID vaccine;  the second-highest answer was that J&J was supporting frontline health workers.

48.    Later in 2020, Moore led the creation of a new platform for J&J called, "Our Race to Health Equity," a U.S. program that acknowledges that "[c]ommunities of color across the United States are disproportionately impacted by a multitude of socioeconomic and public health challenges, which are often rooted in systemic and institutional inequities."  The platform under

her leadership supported community organizations focused on eliminating these inequalities, and, to that end, the Company made a $100 million commitment over five years (through 2025).  As of the end of 2023, this program had invested more than $80 million toward these important efforts and programs.

49.    In 2021/2022, Moore led her global team during the pandemic and continued to deliver on social impact targets.  In late 2021, J&J announced that J&J Consumer Brands would be splitting off from the Company, with J&J's Pharmaceuticals and Medical Technology divisions remaining under the J&J umbrella.  This extremely large-scale corporate split-off entailed a lot of complexity, significant layoffs and fears of layoffs, and a high degree of worry and tension amongst many employees, and it required strong, empathetic leadership by Moore of her GCI team and close management of the numerous corporate functions involved in the restructuring, both of which she delivered on effectively.

50.    In 2022, Moore worked closely with the Company's CEO, Joaquin Duato ("Duato"), on setting up humanitarian aid in Ukraine, including the provision of J&J medical supplies and products, after the Russian invasion.

51.    All of the above accomplishments by Moore, along with numerous other business results and concrete leadership successes by her for J&J, did not go unappreciated.  In fact, before Broadhurst became Moore's Supervisor in 2022, specific and extremely detailed feedback about Moore was always positive and encouraging, as confirmed consistently in previous Performance Reviews and discussed in more detail below.  Thus, Moore always received the strongest or second-strongest review ratings for both the "Business Results" component and the "Leadership" component of her annual Performance Reviews.

52.    One would have thought that, in recognition of her successes for and leadership at the Company, Moore would have at least been in line to remain at J&J, in such an effective managerial capacity, or to be considered for other leadership opportunities, including continued promotion or other suitable roles across such a large, multi-national corporation with deep international involvement, and a pattern of lengthy senior employee tenure, when opportunities arose.  But unlawful discrimination and retaliation against her stood in the way of all that.

**B.    Broadhurst Takes Over Leadership of J&J's Global Corporate Affairs Group and Promptly Makes Clear Her (Unfounded) Disdain for Moore**

53.    In January 2022, Broadhurst stepped into her new role on J&J's Executive Committee and began her leadership of Global Corporate Affairs ("GCA"), which is a Company group that, at the time, combined the Company's Communications, Brand, and Social Impact areas.

54.    There were high-level rumors and speculation, which would only increase over the next couple of years, that Broadhurst was being groomed for even more senior executive roles, possibly to be the next or a future CEO of the Company.

55.    Broadhurst came from a more purely commercial/business background, and her prior roles at J&J had been in the Company's Pharmaceuticals businesses.  She had no background or experience in any of her new, Global Corporate Affairs areas of work at the Company.

56.    Broadhurst took over GCA leadership from Moore's prior Supervisor, Michael Sneed ("Sneed"), who was leaving the Company, and who, like Broadhurst, is Black.  Moore had established a strong relationship with Sneed, and was genuinely hopeful that she would be able to do the same with Broadhurst.

57.    Sneed and Moore had a very positive and productive relationship over many years, and he expressed his views directly and in writing about her strong capabilities and substantial

achievements for the Company in her Performance Reviews, the justification for her generous compensation, and in many other ways over the course of the years.

58.    Broadhurst, including personally and through certain J&J representatives, has made clear to Moore that she and others at the Company consider Sneed not to have been an effective leader and/or that his leadership methods were (supposedly) too hands-off and insufficiently rigorous, as if suggesting that Moore's performance was never properly reviewed under him, or that she could not adapt to the more accountability-focused leadership of Broadhurst.

59.    But Sneed was a recognized leader at the Company, having served in senior Company leadership roles and on the Executive Committee of J&J for decades. To imply that his leadership was ineffective or that his Performance Reviews and Ratings were inflated or invalid is pure nonsense. In actual fact, Sneed's Performance Reviews and Ratings of Moore and her team were based on established goals, targets, and metrics.

60.    Indeed, although one of Broadhurst's leadership themes was that the GCA team needed to adopt a more "business"-oriented approach, Sneed himself was from the "business" side of the Company and held his team members strictly accountable for their performance, just like other good leaders. And despite his supposedly poor leadership performance, J&J had nonetheless retained Sneed at the highest levels of management for many years.

61.    Prior to joining J&J, Moore had gained ample experience of working closely with numerous Fortune 500 CEOs and senior executives, and of pretty much all the different accompanying leadership styles imaginable, including men and women who were incredibly tough, brusque, and demanding leaders, but luckily also fair ones. Through her forty-year career, Moore had excellent relationships with her supervisors and never had her leadership skills or performance been challenged – that is, until Broadhurst joined GCA.

62.     Broadhurst made clear from the very outset that she resented Moore's presence on the GCA Leadership Team.  From Broadhurst's very first introduction to GCA, Moore felt as though Broadhurst was on a mission to pressure Moore to leave J&J, disregarding Moore's actual job performance and her many recognized successes at J&J.

63.     Broadhurst met with Moore in early 2022 (January and March 2022) in connection with Moore's Performance Review, which was very strong for the period leading up to those meetings;  but Broadhurst was perfunctory, dismissive, and unsubstantive.

64.     At a group planning meeting on June 15, 2022, Broadhurst claimed that, while Communications leadership roles would require people with experience and expertise, "any VP of Marketing" could be slotted into the pipeline for Moore's role.  Moore found that comment disassociated from the realities of GCA's work, as well as deeply insulting, humiliating, and belittling.  Moore's field is a highly specialized one, which requires and benefits from specialized expertise and skills, substantial experience, and the broad networks and relationships developed over many years, indeed decades, from that experience.

65.     Moore responded during the meeting that being a Social Responsibility leader is a career path and requires expertise, particularly at J&J, given the Company's philanthropic focus on social impact, public health, medical, global needs, and Environmental, Social, and Governance deliverables.  Broadhurst openly disagreed, in a harsh and cutting tone, which made Moore feel even worse and further marginalized.  Several colleagues shared with Moore after the meeting that Broadhurst's comments to her seemed unnecessarily disrespectful, sharp, and dismissive.

66.     Despite these challenges, Moore continued to work hard and well for J&J through 2022.  In addition to the successes already noted above, she delivered on the social impact targets

that she was given both for J&J's Center for Health Worker Innovation, exceeding Company goals, and for J&J Impact Ventures.

67.    In a challenging period, including COVID-19 and its aftermath, Moore's Global Community Impact team delivered.  The team's commitment to nursing work led to strong data at the close of 2022, with the target of serving 1 million health workers over ten years having been achieved and exceeded by a third, a fraction of the time, in only three years.  Moore also continued building great working relationships with many business and functional leaders across the organization, as well as with J&J stakeholders, domestically and abroad.

68.    Moore was initially perplexed as to why Broadhurst had been so dismissive of her without knowing her or her work, why Broadhurst had singled her out in the June 2022 meeting, and why Broadhurst had been (and would continue to be) so especially harsh on her.

69.    Only later would she learn, based on Broadhurst's own words, that it was because Moore was one of "too many white women" on Broadhurst's leadership team, and that Broadhurst was far more motivated by and concerned with pushing out a white woman from the GCA Leadership Team than with treating her subordinates with respect or having the most qualified people on the team doing this highly specialized work.

**C.    Broadhurst Aggressively Declares that Her Leadership Team Members "Are All Failed Leaders" and that "There Are Too Many White Women on This Team"**

70.    During a GCA Leadership Team meeting on January 26, 2023, which was focused on talent and the team's commitments to diversity, and which was attended by Moore and six others on Broadhurst's leadership team, Broadhurst angrily proclaimed to the group, "You are all failed leaders," in apparent reference to her belief that they were all failing in their commitments to build diverse teams.

71.    The comment struck Moore as extremely unfair, particularly since the team that Moore led was, in fact, a diverse one.

72.    Importantly, the scorecard for Moore's team on diversity issues in their quarterly Reviews had always been "green" and positive, showing that Moore was meeting and, if anything (as Moore was aware of in comparison to a number of other teams' leadership on diversity), exceeding J&J diversity goals.  Thus, according to J&J's own criteria, Moore had always met the Company's diversity goals and was not failing on this issue.

73.    Indeed, Moore has been a longtime proponent of DEI initiatives and has spent a large portion of her career helping to develop, lead, and advance social impact projects.  Moore also strongly believes, in line with the law, that employment decisions must not be implemented in racist and sexist ways that trample the rights of any employees, regardless of their race or sex.

74.    A few weeks later, in a February 15, 2023 GCA Leadership Team meeting also focused on talent and diversity, Broadhurst bitterly complained to Moore and the same six others that, "[t]here are too many white women on this team."

75.    Moore, like many on the team, was taken aback by this directly racist and sexist comment, and saw it as a personal attack.  After all, Moore was a white woman, and she was on the team, so it would be impossible not to take Broadhurst's hostile comment as directed at her, and impossible not to take it to heart.  The very small number of meeting participants also made Broadhurst's comment feel even more personal, even sharper, and even more directly targeted at Moore.  Of the four women on Broadhurst's GCA Leadership team, three were white – Moore, Linda Fedow, and Julie Keenan.  That Broadhurst's words and tone were objectively offensive was clear, and several colleagues commented afterwards how Broadhurst's statement had been offensive and "shocking" to them.

76.     Broadhurst's openly racist and sexist "too many white women" comment also made Moore feel reduced to just the color of her skin and sex-gender, and as if her competence and nearly 40 years of experience and developed expertise in corporate responsibility and the nonprofit sector, on top of a deep bench of valuable global relationships in the field, and her years of hard work and previously recognized and commended accomplishments for J&J, counted for nothing under Broadhurst's GCA leadership.  Moore was shocked to be spoken to in such a discriminatory and derogatory manner.

**D.     Moore Receives an Unprecedentedly and Unjustifiably Negative Review, Leading to a Downgraded Performance Rating and Compensation Penalty**

77.     Shortly after the GCA Leadership Team meetings described above – including the one in which Broadhurst had openly complained about there being "too many white women" on the team – Moore received yet another unpleasant surprise: an unjustifiable and unprecedented negative Performance Review for year 2022, as determined by Broadhurst.  The Performance Review was presented to Moore in February 2023, in a brief meeting with Broadhurst.

78.     Since joining J&J in 2015, Moore had always received, in both of the two performance categories in her annual Performance Reviews, Ratings of either "Exceeds" or "Strong" (or "Fully Meets," under "Strong" - the equivalent prior nomenclature).  At J&J, those Ratings are the two, highest-possible ones that Moore could receive.  Each year's Performance Review was broken down into a "Business Results" category and a "Leadership" category.

79.     Moore's year-2021 Performance Review was prepared by Michael Sneed on behalf of the Company, but was delivered to her in 2022 by her then-new Supervisor, Broadhurst, who also had to sign off on the 2021 "Strong" rankings and Performance Review comments for Moore, and whose influence at GCA was already starting to be felt.  The 2021 Performance Review included very favorable comments on Moore's leadership for J&J, along with a written explanation

by the Company that although Moore was receiving a "Strong" Rating in her Performance Review, she actually deserved a higher rating," *i.e.*, an "Exceeds," but that Sneed had been constrained from providing Moore that higher Rating, even though he had recommended that Moore receive the higher Rating.

80.     The many years of Moore's well-established high ("Strong") and exceedingly high ("Exceeds") Performance Ratings suddenly changed, however, starting with Moore's Performance Review for working year 2022, with Broadhurst as her new Supervisor.  Despite having met and exceeded her goals for that year, including surpassing even J&J's ambitious targets, Moore received an even lower, "Moderate," Rating for the "Leadership" category in her 2022 Performance Review.

81.     That 2022 "Moderate" Rating given by new-Supervisor Broadhurst to Moore was two full Rating reductions below the "Exceeds" Rating that Supervisor Sneed had recommended for Moore as her Performance Rating for the previous year (2021), and a full Rating reduction below the "Strong" Rating that Moore's new Supervisor – Broadhurst – had allowed.

82.     In J&J's Review standards, a "Moderate" Rating is the next-to-lowest ranking available, and being given one can be a serious limiting factor and a damaging signal, particularly for employees at senior levels, as Moore was.

83.     The dramatically lower "Moderate" Performance Rating for 2022 was grossly unjustified when viewed against Moore's actual work, leadership, and accomplishments, for year 2022.  Over the course of that year – aside from a purported issue, debunked below, relating to a standard exit email that Moore had sent about the departure of a former J&J employee, Grant Garrison ("Garrison"), which provided standard new regular contact information in view of his departure – there had never been any indication from anyone of any work issue, or anything that

Broadhurst or the Company had said or done to evince any belief that any adjustments or corrections were needed in Moore's work or her leadership.

84.     The complete absence of negative feedback over the 2022 Performance year, when coupled with a subsequent year Performance critique, deviated from J&J's management principles and review standards.  Typically, before an employee would be dropped to a "Moderate" Rating, there would be proactive dialogue with that employee, to try to help prevent such a significant reduction, and to try to help support the employee in making improvements, so that the employee would be aware of needed improvement and could instead work toward earning at least a "Strong" Rating.  In fact, with regard to employees on her own teams, Moore had always been advised by J&J Human Resources to make sure that the employees she reviewed were not "surprised" by their Ratings after the close of the Performance year.

85.     In Moore's case, however, there had been no such communication with her at all – again, with the one exception concerning the Garrison departure email including standard new contact information – before Broadhurst assigned her the substantially lower "Moderate" rating. There was no notice, no warning, and no opportunity to gain knowledge of any perceived issue or what was coming, much less any chance to improve on any specific perceived matter or issue. Moore was utterly shocked by the substantially lower Rating.   Her supposed leadership weaknesses were never even specifically addressed in her Performance Review.   Moore would have been perfectly willing if not eager to listen to legitimate, constructive, and specific examples of any such deficiencies, and address them accordingly, but none were given.

86.     The conspicuous and impactful decline in Moore's Rating was not only personally and professionally disheartening and distressing, it also concretely and directly affected her pay, bonus, stock, future finances, and future career at J&J.  The lower Rating meant a lower-than-

typical merit increase, bonus, and stock grant for Moore, resulting in a loss of compensation of over $200,000.

87.     It is also worth noting and highlighting that, given how compensation was structured at J&J, the unwarranted Review and low Rating had penalizing compensation effects both in a retroactive sense and future forward.  This is because Moore's J&J compensation for an upcoming year – comprising, as reflected in her J&J compensation statements, her "Current Salary" (plus a related percentage "Merit Target" and "Merit Increase"), a "Bonus Salary"-based amount (plus related possible percentage "Multipliers"), and a "LTI [*i.e.*, Long-term Incentives] Salary"-based amount – was based in part on the Performance Ratings that she had received in her Performance Review in the preceding year.  Accordingly, the significant drop in Ratings had a negative "domino effect" in compensation future-forward.

88.     The unjustified 2022 Review also negatively affected Moore's overall "standing" within the Company and her chances of promotion or even another opportunity within the Company – of which she was soon to be made aware.

89.     Moore could not help but see the year 2022 Performance Review as a significant step in the planned diminishment of her career at J&J, and as a further attempt to force her out. As noted above, a "Moderate" rating at J&J can be particularly injurious and prejudicial for senior management employees.  Thus, even before Moore's eventual January 2024 termination, the negative review that she received for year 2022 significantly affected her compensation and promotion opportunities starting in early 2023, including by effectively broadcasting that her Supervisor viewed her to be on a downward slide and that she could be "on her way out" at J&J.

90.     It is clear that Broadhurst intended to so marginalize Moore within GCA or cut her so deeply with the lower Ratings and attendant financial hits that Moore's position would become

so untenable or that she would become so demoralized that she had to leave, despite all her work and leadership achievements, ongoing and contemporaneous successes, and long-term commitment to J&J and its global stakeholders.

91.     When Moore addressed the unwarranted Performance Review with Broadhurst, Broadhurst responded that Moore needed to build better relationships with senior leaders.  That took Moore completely by surprise, especially given her prior strong track record of building connections with Company leadership, partner leaders, and senior stakeholders, and given her similarly strong track record prior to joining J&J, when she had worked directly, closely, and well with C-suite leaders and management.  Broadhurst's conclusion regarding Moore's relationships with senior leaders, particularly when Broadhurst had never shared names of any senior leaders who supposedly expected more, or what those supposedly unmet expectations were, seemed wholly unfounded.

92.     In discussing the 2022 Leadership Rating, Broadhurst also cited a standard, managerial courtesy exit email that Moore had sent to her team in June 2022 about the departure of Garrison, a former Communications leader at J&J who had supported Moore's team.  At that time, Broadhurst had angrily berated Moore for sending this email, had apparently directed HR to call Moore and inquire if she had had permission to send it, and had claimed that Moore lacked authority to send out an "organizational" announcement.  But Moore's email was standard and had been intended only to inform her team that Garrison was leaving the Company, thank him for his service and provide needed internal contact information given his departure, and such emails were regularly sent out by J&J leaders.  There was nothing out of the ordinary about the email.

93.     Broadhurst claimed that she was concerned that the email had put the Company at risk because she was worried that Garrison would sue the Company, as he apparently believed that

he had been treated poorly at J&J, and Moore had said positive things and thanked him for his work in the email.  (Moore had worked with Garrison as a business partner, and the work that Garrison had done in that partnership had in fact been excellent.  It is notable that Broadhurst was so concerned about Moore saying positive things about Garrison, as if doing so were contrary to a narrative of supposedly poor performance that Broadhurst may have settled on to defend the Company against a potential suit by him.)

94.     Neither Broadhurst nor anyone else had ever informed Moore of the details about any such situation with Garrison, or of any other sensitivity around sending out such a standard thank you/goodbye email, informing personnel of needed information in view of the departure. Nobody had instructed Moore not to send out such a message or given her any background or other reason that would have led her or anyone else to think that such a message should not be sent, or any other reason that might have suggested that she would supposedly have had to ask permission to send it.  Broadhurst's anger at Moore over the standard Garrison email and including any reference to the standard Garrison email in Moore's annual Performance Review were unjustified and wholly inappropriate for the situation, as well as hostile and discriminatory.

95.     Broadhurst had made it clear early on, before ever really even knowing Moore or her work, that she did not like Moore – simply because she was a white female in a leadership position.  But Moore was still surprised that Broadhurst would let her personal feelings affect her professional judgment to this extent.

96.     While Moore was always willing to accept constructive criticism and to do what was needed to try to grow and improve, the 2022 Leadership Rating was so disassociated from her actual work and leadership track record, and from the results she had achieved, that it was not only misguided, but (as Moore started to suspect) pretextual.  It was plainly incorrect and deeply unfair,

and otherwise inexplicable that her Rating, and therefore her standing at the Company and her compensation, should decline so significantly based on a standard "thank you and goodbye" email.

97.    With respect to her leadership, Moore also found it cruelly ironic that she was being faulted for supposed leadership issues by a Supervisor who had apparently deemed it effective leadership to make the blatantly racist comment to her team that there were "too many white women" on it.

98.    In fact, Moore has heard from a high-level J&J employee that Broadhurst has a "track record," including HR feedback, of treating employees poorly at J&J.  There is broad acknowledgement at J&J that Broadhurst can be extremely caustic and dismissive, and that she is known for snapping at employees.  Indeed, Moore has heard from multiple high-level J&J employees that Broadhurst is often considered, including at very senior executive levels, to be a potential liability for the Company on account of her leadership style.

99.    The hostile Review meeting (in February 2023 for 2022) further underpinned Moore's sense of being unwelcome, marginalized, pressured, and pushed out by Broadhurst, for discriminatory reasons.  Although Moore continued to work hard and well for the Company throughout 2023, the situation was taking a toll on her.  She felt harassed and like she had a target on her back, merely for being one of "too many white women," and that concrete steps were being taken to move her closer to the J&J exit door, notwithstanding that she had done nothing at all wrong.  Moore continued to suffer, and still suffers, significant emotional distress caused by the acutely hostile work environment and the targeted personal discrimination and retaliation against her at J&J.

100.    Moore shared her concerns around this time to Peter Fasolo ("Fasolo"), the Company's Executive Vice President, Chief Human Resources Officer.  In a call with Fasolo in

early/mid-March 2023, she raised the disappointing "Moderate" Rating and let him know that she believed she was being unfairly punished for race-motivated reasons.

101.    Moore explained to Fasolo that she believed that Broadhurst's targeted mistreatment of her had to be related to the anger that certain Black leaders at the Company had expressed about the fact that it was Moore, and not a Black or other non-white employee, who had been asked to lead the Company's $100 million external commitment to eliminating racial health disparities, *i.e.,* its "Our Race to Health Equity" program ("ORTHE").  Moore had been put in charge of ORTHE program in or around June 2020, in the wake of the death of George Floyd.

102.    The Company's Chief Diversity Officer, Wanda Hope ("Hope"), a Black woman and a longtime close colleague of Broadhurst, had been particularly and openly angry and upset that Moore was leading ORTHE, instead of her and her Diversity, Equity & Inclusion team.

103.    Given all the resulting tension at the time, Moore had even raised Hope's and certain other Black employees' anger toward her over her being chosen to lead the ORTHE program with key J&J executives.  But Alex Gorsky (then CEO of J&J), Fasolo, and Sneed told Moore that it was her and her team's expertise and responsibility to handle ORTHE and that she should stay the course, since she and her team regularly set and delivered on external social impact targets, and that they (the senior executives) would provide support for Moore while she continued to lead the program.

104.    In her March 2023 call with Fasolo, Moore told him that she believed the anger surrounding her leadership role on ORTHE was still continuing to be directed at her, now by Broadhurst, and including in the form of unfair race-based treatment from Broadhurst.

105.    Fasolo told Moore that he believed all of the ORTHE-related tension "was all behind us," but Moore said she did not think it was.  Indeed, Moore was beginning to sense more

and more clearly that Broadhurst's immediate, sustained hostility toward and continual diminishment of her were the result of racially motivated vindictiveness, and that her career at J&J could be at risk.

106.    Fasolo, however, expressly assured Ms. Moore during their call that she was "critical talent" at J&J.  She should continue leading the ORTHE program, and he supported her.

107.    Despite that assurance, Broadhurst's harshly negative and disdainful treatment of Moore only worsened, and increasingly affected Moore's personal life.  She had difficulty sleeping at night, worrying about what the next unpleasant surprise might be and whether she would be outright fired.  She approached every meeting and email with or about Broadhurst with trepidation, given how palpable Broadhurst's hostility toward her was, and given how her requests of Fasolo appeared not to lessen that hostility.

108.    Moore would very soon be made aware that her suspicions and concerns were warranted.

**E.    Broadhurst Removes Many of Moore's Responsibilities and Assigns Her a Supervisor with No Social Responsibility Experience, Effectively Demoting Moore**

109.    In a meeting during the week of March 20, 2023, Broadhurst informed Moore that she (Moore) would be getting a new Supervisor, Howard Reid.  Going forward, Moore would report to Reid, who is Black, and he would report to Broadhurst.

110.    According to Broadhurst, this change would not impact Moore, as her role, responsibilities, and title would all remain the same.  But after Reid was publicly announced on March 24, 2023, that soon proved not to be the case.

111.    Reid had been recruited to J&J by Broadhurst some fifteen years prior, and by his own admission, he had no background, expertise, or experience whatsoever in Corporate Social Responsibility, Social Impact, or Global Public Health when he became Moore's Supervisor.  In

connection with his new role, although he had only recently been elevated from Senior Director to VP1 status, he quickly jumped up again, very significantly to VP2 status.

112.    Relatedly, the majority of new members brought by Broadhurst onto her GCA teams, or into roles adjacent to or supporting her, were Black.  That was especially true of new hires in the earlier stages of Broadhurst's tenure at GCA who were to work particularly closely with her, including LaToya Davis ("Davis"), Human Resources; Antoinette Cheek, Communications; Erica Jeffries, Strategy & Operations;  Michael Morton, Strategy & Operations; and Reid.

113.    Although Moore appreciates that Broadhurst, as the new GCA leader, may have wanted rapid change in building up her own team, it is not the extent of such change *per se* that was troubling, but that such change was handled in such a racially-inflected manner, resulting in the unfair treatment of existing and prospective employees.  Moore's understanding is that Broadhurst's tenure at GCA has been marked by a pattern of such unfair practices, including the non-hiring of non-diverse prospective employees and the failure to promote non-diverse employees, on the basis of race and in conflict with the candidates' or employees' relevant merits, experience, and qualifications.

114.    This pattern of race discrimination and unfair treatment impacted Julie Keenan ("Keenan"), one of the other "too many white women" on Ms. Broadhurst's team.  In connection with the retirement of Linda Fedow ("Fedow";  the third of the "too many white women") from J&J in or around 2023, Broadhurst announced that the new Pharmaceuticals Communication & Public Affairs leader was going to be Sandra Waite ("Waite"), a Black woman from outside the Company.

115.    Keenan had been interested in the role, but later told Moore that when she had gone to Broadhurst and Davis and asked to be considered for the position, she had been told that she was not qualified for the role. Keenan, who knew Waite and had a similar background, was every bit as qualified as Waite. Yet she was discouraged by Broadhurst and Davis from even applying for the role.

116.    As to Mr. Reid: Despite his complete lack of relevant experience, Reid was now assigned to handle matters and lines of responsibility that Moore had been managing. Specifically, Reid was now leading all aspects of the team's work; approving key NGO partnerships and platforms; making decisions for employee engagement programs; and making decisions for J&J's Impact Investment fund – all of which were previously Moore's responsibilities.

117.    Thus, Moore's leadership role and practical responsibilities were stripped from her, and she was for all intents and purposes demoted.

118.    Further, promptly after Reid's arrival, Moore was excluded from information and meetings concerning the group that she had previously led, often with no communication to her. Her absence from those meetings isolated her from information needed for her job, and excluded her from dialogue and interaction with the J&J CEO and other J&J senior managers, some previously her peers.

119.    Reid met with Broadhurst on a number of occasions to discuss the new strategy for the group, without Moore having been invited to those meetings. Moore was also excluded from Reid's meeting with CEO Duato about this new group's plan.

120.    Importantly, Moore's demotion was also externally visible. For example, she was no longer the executive spokesperson for the J&J social impact area – this role was also taken over by Reid.

121.    After Reid was appointed Moore's Supervisor, he participated in meetings with USAID and the Global Fund (a worldwide partnership to defeat HIV, TB, and malaria), and he had speaking opportunities with Aspen Health and other important stakeholders.  Some, if not all, of these engagements would have been allocated to Moore prior to her demotion.

122.    Reid was now the day-to-day leader and decision-maker for Global Community Impact, despite Broadhurst's contrary assurances to Moore that he would be layered into her area without any impact on her role and responsibilities.  Having decided there were "too many white women" on the GCA team, Broadhurst sidelined Moore, dismissing her decades of experience in this specialized field, and championed and promoted Reid to be one of the leading faces of GCA, despite his total lack of experience in any field related to this important work.

## F.    After Moore Raises an Honest Complaint of Racially Motivated Discriminatory Treatment and Harassment, J&J Retaliates Against Her

123.    On or around June 21, 2023, Moore sent a detailed, sincere, and honest letter via email to Broadhurst, copying Fasolo, that outlined her concerns about her and Broadhurst's time together on the GCA Leadership Team and what Moore felt was Broadhurst's and the Company's unfair, discriminatory and retaliatory treatment of her – including Broadhurst's disparaging, racially insensitive, and sexist comments;  Moore's unwarranted Performance Rating;  and the inescapable sense that Broadhurst was determined on diminishing Moore's standing in the Company and even on pushing her out.

124.    It was the most difficult message that Moore had drafted and sent in her entire career, but she believed it was necessary to expose and address the unfair treatment she was experiencing.  Indeed, J&J's Code of Business Conduct (the "Code") states:  "You [the Employee] have a responsibility to speak up when you are in a situation or are aware of a situation that you believe may violate or lead to a violation of the Code, Company policy or the law."

125.    Moore's message was also measured, forward looking, solution oriented, and collaborative in spirit, and she was hopeful that raising the issues with Broadhurst would allow them to "work toward a solution together."

126.    On August 1, 2023, Moore met with Broadhurst and Reid to discuss the concerns that she had raised in her June 21, 2023 email, including her complaint of hostility, discrimination and retaliation.  The meeting was brief and perfunctory, and Broadhurst was dismissive, making no effort whatsoever to clear the air or facilitate a better working relationship.  She was hostile and clearly not interested in discussing Moore's concerns, instead telling Moore that two employees on Moore's team had raised some undefined concern about Moore a year before.  Reid did not participate in the retaliatory drubbing, but also did not speak up in support of Moore in any way.

127.    In response to Moore's having raised legitimate concerns about hostility, discrimination and retaliation, J&J launched an internal "investigation," led by outside counsel Barbara Hoey, Esq. ("Hoey," of Kelley Drye & Warren LLP), and with which Moore fully cooperated.  Moore was cautiously hopeful that the Company would take her concerns seriously. However, that soon proved not to be the case.

128.    Indeed, in vindictive fashion, the Company suddenly began spending time and resources on investigating Moore herself, in an apparent attempt to scare her off and establish putative grounds for attacking her work, and eventually terminating her.  Thus, Moore, who had done nothing wrong and who should have been shielded from retaliation as a matter of law, would nonetheless begin experiencing the severe consequences of having lodged a complaint of discrimination.

129.    Just after the Company's investigation of Moore's concerns had begun, J&J's Employee Relations team informed her, in late August 2023, that two complaints from employees

claiming to be from the GCI team, *i.e.*, the team Moore had formerly led, had been submitted to J&J's "Our CREDO" hotline, which is the Company's anonymous employee complaint hotline. Moore was advised that the supposed complaints dated back to October 2022 (shortly before Broadhurst was to become Moore's Supervisor), and that the employees' concerns focused mainly on three areas: alleged favoritism, alleged fear of retaliation, and a perceived lack of direction and strategy in GCI.

130.    The timing with which J&J chose to consider and address these undisclosed and very belated complaints (which had never entered into Moore's Performance Review or any prior discussions with her) was highly suspect at best, given Moore's recent raising of concerns about discrimination and retaliation, given her marginalization on the team, and, again, given that some of these supposed complaints were by then a year old. The only concern Moore had been aware of dated from around mid-2023, which had been fully investigated and found to be without merit. No specific information was ever shared with Moore regarding these complaints.

131.    That was also the case with focus groups that Employee Relations suspiciously decided to hold with Moore's team and former team members after the lodging of her June 2023 complaint of discrimination, as those interviews appear to have been spuriously designed to look for additional possible reasons to call her leadership abilities into question, create an *ex post facto* paper trail, and discredit her. In fact, Moore received direct verbal feedback from multiple employees on her team stating how uncomfortable these focus groups were and how the employees felt that the meetings were part of a "fishing expedition" trolling for issues, and that they (the employees) had been appalled and offended by the process, and had been "pitted" against each other. Some of these employees also said that they had never heard of J&J undertaking this process in decades, and some requested separate conversations with Employee Relations out of concern

that Moore was being targeted or to try to ensure that Moore was not being targeted. Moore raised such concerns from her team members in an email to HR and Reid.

132.    The Company's internal investigation, led by Hoey, of the discrimination concerns that Moore had raised was also highly disappointing. Notably, at no point in that investigation did J&J or Hoey ever deny to Moore the central fact that Broadhurst had made the egregiously racist and sexist statement that there were "too many white women" on her leadership team.

133.    Instead, in an investigative interview with Moore, Hoey asked, in a dismissive tone, why Moore would think that the statement had been directed at her. But as explained above, it was entirely obvious that Broadhurst's statement – made in a small group setting consisting of seven members of her team, three of whom were white women – had been directed at Moore, one of the three "too many white women."

134.    Moreover, other facets of the manner in which the investigation was conducted made it feel as if Moore herself was the target of the investigation, not the one who had courageously and honestly raised discrimination concerns, meriting investigation of them, as well as protection of Moore against retaliation. For example, while Moore was on her September 2023 business trip to Kenya, where she participated as J&J's representative in meetings with the President of Kenya and other luminaries, Hoey emailed her several times, chasing her to give her the "opportunity for a final interview, to share any additional information and answer some final questions." Indeed, at Hoey's urging, she and Moore then had a Zoom meeting just a few hours after Ms. Moore had touched down from her more than 24-hour trip back from Africa. Ms. Moore was exhausted but pulled through in the hopes of getting to a resolution of the investigation.

135.    On that Zoom meeting, Hoey told Ms. Moore that it was not an interrogation. But that session, and others before it, felt very much like an interrogation to Moore.

136.    At no time during these investigative meetings were Moore's concerns genuinely addressed, the very concerns that had given rise to the "investigation" in the first place.

137.    It should also be noted that J&J's Code of Business Conduct states: "Whenever we become aware of a violation of the Code, Company policy or the law, we will act to address the problem and prevent future occurrences.    Depending on the circumstances, corrective and preventive steps might include training, counseling and disciplinary actions up to and including termination of employment."

138.    The Code also stresses that J&J "does not tolerate retaliation against anyone who raises a concern under this Code or assists with an investigation. Any employee who engages in retaliation will face disciplinary action, which could include termination of employment."

139.    Despite this Code, it was being made clear to Moore and would continue to be made clear to her that J&J and Broadhurst were vindictively intent on punishing her for having come forward with her complaints of hostile work environment, discrimination and retaliation.

**G.    The Retaliation Continues, as Moore Is Officially Demoted and Overlooked for Promotion, While Reid, Despite His Lack of Experience, Is Further Promoted**

140.    Even though Moore faced an extremely challenging and hostile work environment with her leaders in 2023, she maintained her professionalism throughout the year and continued to work very hard to deliver her results for the Company and to provide leadership to her team.

141.    She achieved and exceeded her targets that she had been given and delivered well beyond expectations.    Some of the 2023 milestones and highlights for which Moore was responsible are noted as follows:

142.    Moore's team exceeded their publicly committed social impact targets focused on supporting health workers globally, as well as their targets and expectations for the work focused on nurses in the U.S., and their health equity-specific commitments.  Her team exceeded the goals

related to JJIV impact investments, which also continues to be a strong reputational driver for the company.  She also served as the J&J leader on the WHO Academy major multi-year investment, including serving on the Institute of France committee of leaders working alongside President Macron of France to build and launch the WHO Academy.

143.    Moore's high level work and leadership, in practice, continued, recognized and indeed invited by J&J.  After Reid became sick and could not attend and deliver his speaking engagements, he asked Moore to cover for him at events during the September 2023 United Nations General Assembly.  Moore smoothly stepped in to act as the J&J Leader and spokesperson at these events, which were focused on global health and sponsored by critical global entities important to J&J's business and social impact efforts, such as the Gates Foundation, numerous NGO organizations, and WHO entities;  and she was proud to represent the Company.

144.    During 2023 and, indeed, still into 2024, the positive reputational benefits that J&J enjoyed and enjoys, among important external opinion leaders and stakeholders, for its contributions to social impact were and are the direct results of Moore's own strategic thinking and her leadership of the GCI team.  That is particularly true with respect to the very positive reputation J&J has earned for its support of frontline health workers, nurses, and health equity efforts.

145.    Indeed, these areas and strategic focal points, developed by Moore and her team, continue to be the key social impact areas for the Company, and continue to be touted by J&J even after her termination.  For example, in June 2024, five months after Moore's termination, J&J released its "2023 Health for Humanity Report," which prominently featured the social responsibility efforts and related successful data on J&J's health equity and frontline health worker initiatives led by Moore.  These and similar initiatives of Moore's are also frequently featured in

J&J's internal and external social media.

146.    Despite all these contributions to and successes for the Company, the retaliation against Moore continued.  On September 29, 2023, the day after she returned from her J&J business trip to Kenya, she had a meeting with Reid and Davis (Broadhurst's former HR business partner, who, upon information and belief, departed the Company in August 2024).  The discussion related to a "restructuring" that would combine two separate teams: Global Public Health and Global Community Impact, the latter of which Moore had previously led.  Reid informed Moore that he was ready to share the proposed organizational changes, with the two departments having been combined into one, to be led by him, to Moore's disadvantage.

147.    Reid and Davis added that the "reorganization" had gone through a review process and that Moore would be given a "new role," as Global Head of Social Impact Investments and Partnerships, with a lower-level pay grade and title.  Moore's role as Senior Vice President, GCI was pay grade 51;  the new role would be leveled at pay grade 50 – and would be a substantial demotion from VP2 to VP1.

148.    However, Davis informed Moore that she would be put on a so-called "Personal Pay Grade (PPG)" through December 31, 2025, and that Moore's pay and benefits (targets for bonus and stock grants) would therefore remain at their current level until that time, as reflected in a September 29, 2023 PPG acknowledgment letter provided to Moore.  Being offered a special Personal Pay Grade surprised Moore, because she had now been demoted twice since Broadhurst had become her Supervisor, and because the Company had only months before attacked her leadership efforts.

149.    In all events, this new reorganization also further elevated Reid, unfortunately at Moore's expense, in that his new role further usurped her responsibilities and areas of expertise.

Reid – who, again, had personally conceded that he had no background or expertise at all in Corporate Social Responsibility, Social Impact, or Global Public Health when he actually became Moore's Supervisor earlier in the year – was tasked with responsibilities in which he lacked experience, in stark contrast to Moore and her vast experience of nearly 40 years in that specialized field of work.

150.     That contravened J&J's Code of Business Conduct, which states that "[w]e base employment decisions on merit, and consider qualifications, skills and achievements.  We do not tolerate discrimination based on characteristics such as age, gender, race, ethnic background, sexual orientation, gender identity, national origin or religious beliefs."

151.     This latest promotion of Reid made Moore recall that in his first meeting with Moore's team, Reid was asked why he thought he had been selected for the role, to which he answered that Broadhurst was his "sponsor," and that she had "tapped him on the shoulder" for several higher roles at J&J previously, including the one he was promoted to in March 2023.  Reid ended by saying, "Vanessa called me."  Thus, ostensibly, there seems to have been no formal or standardized review process for the selection of Reid in his role as Moore's direct Supervisor.

152.     The reorganization of the GCI team resulted in Moore losing a significant portion of any remnants left of her work or colleagues.  At the beginning of 2023, Moore had a team of 52 people reporting to her as the head of GCI.  Following that demotion, she had roughly half that number of people reporting to her.  Four of the five groups removed from her direct leadership were those areas responsible for creating social impact: Commitment to Nursing strategy;  Our Race to Health Equity strategy;  Health Worker strategy;  and the J&J Patient Assistance Foundation.  This work to drive social impact was the "heart and soul" of Moore's work and career, and those responsibilities were being taken away from her.

153.    Now, not only had Moore's team been dramatically reduced through the "reorganization" and demotion, but the primary focus of her work – driving the social impact strategy that she had created to support health workers around the world – was being supervised by Reid, who self-admittedly had no existing competence or experience in these areas, instead of by her.  Her demotion and the lower VP level (VP2/VP1) also brought with it a further loss of visibility (such as at an important annual meeting of senior leaders to which only employees at the VP2-level or above are typically invited), and exclusion from meetings with J&J's CEO and other senior leaders.

154.    Such changes were certainly not in keeping with Broadhurst's earlier insistence that Moore's role and responsibilities would not be impacted when Reid became her Supervisor.  These impacts to Moore were so obvious within J&J that, soon after the "reorganization" and her demotion were officially announced, on October 26, 2023, numerous people on her team and numerous colleagues from across the organization reached out to her to see if she was doing okay, and to let her know that they felt sorry for her.  In other words, people treated Moore like she had just been fired or was being forced out – as she soon would be.

**H.    Moore Files an EEOC Charge of Discrimination Against J&J and, Following the All-Too-Predictable Conclusion to the Sham Investigation, Is Shortly Thereafter Retaliatorily Terminated on Pretextual Grounds**

155.    By late 2023 – in light of J&J's inaction on, lack of genuine interest in, and lack of empathy or outreach toward her (particularly from HR and Employee Relations) about her well-being and her honest complaints of unfair treatment and unlawful discrimination;  in light of J&J's retaliation against her for raising those complaints;  and in light of its apparently unwavering protection of Broadhurst, despite the undisputed facts – Moore felt that she had no choice but to undertake measures to formally protect her legal rights.

156.    She therefore filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against J&J on November 3, 2023.

157.    Unsurprisingly, but in further violation of law and J&J's own Code, the retaliation against Moore continued following the filing of the EEOC Charge, as did the deterioration of her position at J&J, and ultimate termination.

158.    In mid-December 2023, Reid sponsored a mandatory two-day offsite meeting in New Hope, Pennsylvania, for his direct reports and a few members of his extended leadership team.  The intent was to build trust for the new leadership team, primarily through the sharing of personal experiences, positive or negative.  There was a particularly intense session where attendees were asked to "empty" their baggage in order to move forward with a clean slate.  "Emptying" baggage meant sharing one's challenges and issues with the other members of the team, and all attendees were required to take a turn.

159.    During this session, Moore shared that she had concerns about the work environment at J&J, that she no longer found it "safe," and that she did not fully trust Reid or believe that he and Broadhurst valued her experience and expertise.

160.    The following day, December 15, 2023, Reid had scheduled Moore's 2023 Performance Review, which was highly unusual in its timing, given that J&J Performance Reviews regularly take place after the close of the relevant year, in January or another time in Q1 of the following year, with bonuses and compensation updates then provided in February.  This was yet another example of Moore being singled out for differential negative treatment, as others did not have their Performance Reviews until Q1, which then enabled them to receive their bonus and stock vesting on early-year payout and vesting dates.

161.    Reid kicked off the Zoom review by saying it was a little awkward to host Moore's Performance Review right after the New Hope meeting, where people had been asked to share their personal feelings and experiences.  Reid then informed Moore that she was being given an overall rating for the year of "Strong" for the Results dimension of her review, and "Moderate" for the Leadership dimension of her Review:  "On the Results side, you achieve Strong Results. Of course the goals have been met, and on the Leadership side, I captured it as mixed leadership with some goals being met and some expectations not being met."

162.    Reid told Moore that, from a leadership perspective, there were "three themes" that had been noted in the Employee Relations focus groups and "three areas of improvement" identified from observation and from direct and CREDO-based employee feedback.  Those three points distilled to the following:    (i) "team engagement" and "connectivity," including cohesiveness in the GCI leadership team and "synergy" across GCI teams;    (ii) "talent development," including processes for promotions;    and (iii) "responsiveness to feedback," including by GCI leaders from the broader organization.

163.    Reid's vague, unsupported, and conclusory Review was a study in contrast with the specific, detail-oriented performance reviews Moore had previously received over many years from Sneed. Notably, Reid concluded his substantive review with a clear commitment to continuing to work with Moore, saying:  "And I wanted to end with overall, and I really do mean this. I remain committed to working with you on these areas of observed and communicated improvement while building on the foundation of the great social impact work being delivered across the organization."

164.    In response to the vague Leadership criticisms she had received, Moore told Reid that she was not fully aligned with the feedback and the low "Moderate" Rating for 2023, and that

she had worked hard in 2023 to deliver results, meeting and exceeding her targets, and supporting

the team.  She explained to Reid that 2023 had been a challenging year for the full GCA team, and

that negative feedback was being found across the board in the GCA organization (*i.e.*, applicable

as well, if not more, to both Broadhurst and Reid), and suggested that leadership should be a shared

responsibility.  Employee surveys about GCA and the Company, and about GCA leadership and

J&J leadership more broadly, indicated that employee sentiments were not specific to or focused

on Moore's leadership.  Nonetheless, Moore had hosted meetings with her team to hear out their

concerns and she had even created a Talent and Culture team to be sure feedback was consistently

reviewed and addressed.  Moore's team was now under the leadership of two new executives

(Broadhurst and Reid) who had literally no prior experience or expertise in any of the GCA areas

they were supervising.

165.    With such considerations in mind, Moore told Reid at the end of her Review:  "So,

I will respectfully disagree but certainly I will take the feedback, think about the feedback, but just

to let you know, I don't think it's an accurate reflection for a really tough year."  Moore was in no

way hostile or uncooperative in saying this to Reid, or in any of her other prior or subsequent

interactions with him.

166.    In that Review meeting, Reid then responded to Moore's respectful disagreement

as follows:  "Sure.  I accept that.  I accept it.  Thanks for sharing your feelings and thoughts on the

review. . . . I appreciate you, listening to the feedback, and voicing the fact that you're not aligned

to it."

167.    The Review ended on equally professional and collegial note.  Reid said, "Despite

the challenging feedback, I still wanna extend my gratitude."  Moore responded, "I appreciate it,

Howard." Reid concluded by reiterating how impressed he was with Moore's accomplishments and positive performance for the Company: "I've seen what you've done."

168.    Notably, this was far from the first time in 2023 that Reid had expressed to Moore how much he acknowledged and appreciated the quality of Moore's work and how much he enjoyed working with her. In fact, on account of his inexperience in all GCA matters, Reid had relied heavily on Moore's leadership, guidance and assistance throughout 2023, with Moore in practice assuming numerous responsibilities of his (despite getting paid less than him) and being entrusted by him regularly. Reid had been highly complimentary of Moore throughout 2023, had stated how much he enjoyed working with her, and had indicated to her how impressed he was by her handling of projects and by the sophistication and effectiveness of the many initiatives she led. In periods of his absence, Reid entrusted his role to Moore.

169.    Very shortly after the 2023 Performance Review, Moore met, on January 3, 2024, with Kerri Loiselle ("Loiselle"), Senior Manager, Employee Relations, Human Resources, regarding the Company's and Hoey's investigation – purportedly of Moore's complaint against Broadhurst.

170.    Loiselle advised Moore that the investigation had concluded and that it had been determined that her claims of discrimination (detailed in her June 2023 correspondence to the Company, followed by her November 2023 EEOC Charge) were "not substantiated." Again, however, neither Loiselle nor anyone else from J&J ever denied that Broadhurst had uttered the discriminatory statement that there were "too many white women on this team." Loiselle also stated that the 2023 Employee Relations focus groups looking into Moore were "not deemed to be a form of retaliation" for her having raised her concerns about discrimination.

171.    Less than a week later, on January 9, 2024, Moore suddenly had a "mandatory meeting" added to her calendar for 4:00 that afternoon.  When Moore joined the Zoom call from her home office, both Reid and Davis were already on.  Reid said that they wanted to discuss her "performance in [her] current role," and that, as he and Moore had already discussed on December 15, "you haven't met expectations of a senior leader."  That was a misleading characterization, since Reid had only weeks earlier had provided a "Strong" rating concerning her work and claimed (vaguely) that Moore's leadership was "mixed," with only "some expectations not being met."

172.    Reid then stated that because, he claimed, Moore had not been aligned with his comments on her Leadership rating, he no longer believed he could work with her and was terminating her employment with J&J, effective as of January 31, 2024:

> In the year-end discussion, you mentioned that you didn't believe there was a leadership gap or agree with the feedback despite ongoing discussion throughout the year.  I don't see how we're gonna be able to correct this shortcoming.  And since you're refusing to recognize the gap, I don't believe we'll be able to work together towards a successful outcome for you in this role.  As a result, we've made the decision to terminate your employment effective January 31st of this year.

173.    Although Moore had well before begun to fear and expect Broadhurst's ongoing retaliation against her, including the possibility of being fired, this was still a surprising turn of events.  Approximately three weeks earlier, during her annual Performance Review, Reid – her direct Supervisor – had assured Moore that he remained committed to continuing working with her.  Furthermore, when Moore had told him during that Review that she had to respectfully disagree with and was not fully aligned with the Rating and some of the feedback, Reid had thanked her for sharing her thoughts and feelings, and praised her again for all she was doing for the Company.

174.    It was also Reid who had offered her a restructured leadership position, with a written 2-year "Personal Pay Grade" guarantee, only weeks earlier.

175.    Moore could not help but believe that her termination had actually been decided long ago by Broadhurst;  that her termination had only been delayed by the Company's slowness in completing its investigation, which was turned against Moore;  that the timing of her Review and aftermath were designed to damage her (and did so profoundly);  and that Moore's true performance and respectful disagreement with portions of her Review had played no actual part in the decision to terminate her.

176.    The written Company communication of Moore's departure from J&J was circulated on January 12, 2024.  Despite the Company's decision to terminate Moore, J&J acknowledged in its announcement about her departure that she had "streamlined the company's social impact work, corporate citizenship, and strategic philanthropy to support and champion people on the front lines of care through the J&J Global Community Impact team."  The announcement acknowledged further: "This included introducing innovative mechanisms to deliver impact such as the Center for Health Worker Innovation and J&J Impact Ventures (JJIV), expanding the J&J Talent for Good program and stewarding J&J Nursing and Our Race to Health Equity commitments in the United States."  It went on to note that "Lauren led the J&J Foundation and was president of the J&J Patient Assistance Foundation."

177.    Soon after the announcement of her departure, Moore received a steady stream of messages from J&J colleagues praising and thanking her for her leadership and accomplishments during her tenure with the Company.  There were scores of achievement confirmations and accolades from her diverse GCI team and other colleagues, speaking very directly and explicitly to her leadership of GCI work and the positive reputation it has helped build for the Company.  In addition, she received many direct communications from J&J employees and executives recognizing her service, innovations, contributions, and management prowess.

178.    Although Moore greatly appreciated all of the accolades and the outpouring of support she received from fellow executives and other employees, she could not help but note the stark contrast between, on the one hand, the positive messages she was receiving about her leadership and contributions to J&J, and, on the other hand, the claims by Broadhurst and Reid that her leadership was so deficient as to warrant demotion and eventual termination – and termination based on Performance at that.  The laudatory notes from her colleagues made it only clearer that Moore was being pushed out of the Company not because of any true failing or lacking on her part, but because it had been decided that there were "too many white women" on the GCA Leadership Team, and because her race and gender mattered more to the new leadership than her expertise, performance, and accomplishments in her very specialized field.

179.    In that regard, it is notable that the two people only very recently hired by J&J and Broadhurst to pick up Moore's former responsibilities in the Global Health Equity group are non-white:  The person hired as the more-or-less direct successor of Moore to lead philanthropic work is Asian-American (Alice Lin Fabiano, Global Director, Social Innovation & Investment, Impact Ventures/J&J Foundation);  and the person hired as Global Lead of Healthcare Workforce Strategy is Black (Isha Williams).

180.    Upon information and belief, Broadhurst and/or Reid (at Broadhurst's direction) directly targeted these specific, diverse candidates, even though, at least for the role that Alice Lin Fabiano was later offered, an earlier search process had been conducted and yielded potential internal and external candidates.

I.    **J&J's Highly Punitive and Retaliatory Compensation Decisions Against Moore**

181.    As noted above, Moore's termination went into effect on January 31, 2024.  J&J's chosen timing for the termination, and its intransigence with respect to possible flexibility on that

date, was particularly vindictive and acutely damaging to Moore, and continues to impact her financially.

182.    First, the termination date was less than two weeks before a substantial amount of her granted stock (valued at more than $250,000) would have normally vested, on February 8 and 13, 2024 – literally just days after her termination date, regarding which J&J through its legal counsel, Anthony Haller, Esq. ("Haller"), showed complete intransigence.  And because Moore was roughly a year away from her ten-year anniversary with J&J and had not yet been at the Company for a full ten years, she was considered ineligible to keep any unvested amounts or the J&J Retirement Healthcare Benefits.

183.    J&J has a "3-year cliff" for most stock to vest, and Moore was now being forced to completely miss out on the vesting of all of these options by a mere 8 or 13 days.  These options had been awarded to her years earlier in exchange for her strong work for J&J and had been spelled out explicitly in the J&J compensation documents as being part of her compensation, described as "LTI Salary" along with her base Salary and "Bonus Salary".

184.    It stands to reason that J&J intentionally timed its retaliatory termination of Moore in such a way that she would forfeit her chance to exercise any of these options and therefore lose the considerable income they would have provided.  In fact, Moore had specifically requested that she be allowed to continue in some form of qualifying employment or role for just a few more weeks or even days, at least through her stock vesting dates in early February 2024, but J&J vindictively refused any such accommodation.  This is even more outrageous when considering that Moore – after nearly nine years with the Company – was given less than one month notice of her termination.

185.    Moore, through her legal counsel, even proposed good-faith, expedited negotiation of her legal claims if J&J were to postpone her termination date by a matter of weeks, in order to forestall forfeiture of the valuable options that she had worked so hard to earn, and that were being jeopardized by J&J both illegally and, given the dates involved, unnecessarily.  That good faith proposal was retaliatorily rejected.

186.    Second, Moore was spitefully denied her year-2023 annual performance bonus (based on her "Bonus Salary," as well as a performance bonus "Multiplier," effectively adding on 30% to the bonus amount), despite having delivered strong results and excellent performance for the Company over the course of that year (as described above);  despite having been guaranteed by J&J in October 2023 that her compensation package would remain the same;  and despite having been given written confirmation by J&J's own legal counsel that she would receive the 2023 bonus.

187.    After the bonus-payout date of February 22, 2024 passed without Moore receiving any bonus payment, Moore discovered for the first time that her previously approved bonus had now been denied.  When Moore inquired through her counsel as to why, J&J's legal counsel answered in a February 28, 2024 email that he "had originally been told that the bonus would be payable but it seems that there was a misunderstanding over which Category this situation fell under given the extant severance agreement."

188.    Haller also separately informed Moore through her attorney that, after checking with J&J's Employee Relations group, it had been "the business" and "a business leader" – presumably, Broadhurst – that had decided not to pay Moore any Bonus Salary at all, thereby overriding the Company's prior Bonus Salary approval, and even contradicting the Company's prior confirmation to Moore's counsel that Moore was entitled to receive and would receive her 2023 Bonus Salary (having completed 2023 and worked through the October 2023 required active

work date).

189.    Although J&J agreed to review the denial of the 2023 Bonus, in June 2024 the Company informed Moore that she was ineligible for the Bonus Salary because her termination was due to alleged "Performance," and because J&J's Bonus eligibility policy is that such terminations, just like terminations for "Misconduct/Discharge for Cause," or for "Violation of Policy," constitute a "Category 1" termination, for which employees can receive only discretionary bonuses if the termination occurred after the Bonus-payout date.  In effect, Moore was being treated as having been terminated for cause.

190.    Moore was never made aware of any specific supposed performance failures;  and that which she had been tasked with performing, she performed extremely well.  Accordingly, Moore, who had actively worked throughout year 2023, was at the very least entitled to her Bonus Salary under J&J's bonus eligibility policy for "Involuntary Termination (Category 2)."  Indeed, her most recent annual Performance Review – by Reid – states that Moore "Achieved strong results.  All goals have been met or most met and some exceeded."  That Moore was terminated and completely deprived of her 2023 Bonus Salary for supposed Performance reasons is completely without basis, and merely continues the discrimination and retaliation she ensured over the past two years.

191.    Third, Moore's unjustified termination also resulted in her being deprived of a range of valuable J&J retirement benefits.  In order to be formally eligible for full J&J retirement benefits, including subsidized health care, Moore would have needed to remain an employee through mid-October 2025;  but her unjustified termination prevented her from reaching that date.

192.    Through counsel, Moore had proposed that her employment status be bridged through that ten-year-service qualifying date, as she understands the Company has done for others,

but again, the Company declined.  Moore's understanding, including based on the Company's well-known reputation in this regard, is that J&J is typically very good about bridging valuable employees to full retirement.  Such accommodation was punitively withheld from Moore, reflective of the continued hostile, discriminatory and retaliatory punishment against her for resisting the discrimination against her and speaking out to Broadhurst and the Company against it.

193.    Moore has received a stream of formal documentation from J&J acknowledging her "Retirement from J&J," including a "Certificate of Retirement" and a letter she received on February 22, 2024, thanking her for her lengthy contributions and service, as signed by CEO Duato, and which also included a separate notification portion stating, "Congratulations on your recent retirement."  Moore continues to receive J&J materials advising her that she has "Retired" from J&J  She is thus acknowledged by the Company itself as if she is an official J&J retiree, while being denied the full benefits of a J&J retiree for discriminatory reasons.

## ADMINISTRATIVE PROCEDURES

194.    On November 3, 2023, Moore filed a Charge of Discrimination, embodying the claims set forth in this Complaint, with the EEOC, the New York State Division of Human Rights, and the New York City Commission on Human Rights.

195.    On March 19, 2024, the EEOC issued a Notice of Right to Sue to Moore.

196.    The parties entered into a Tolling Agreement, which tolled the running of the applicable statutes of limitations for a certain period.  As a result, Moore has brought her claims within 90 days of receiving her Notice of Right to Sue.

## FIRST CAUSE OF ACTION
## AGAINST DEFENDANT J&J
### (Unlawful Employment Discrimination & Retaliation in Violation of Title VII)

197.    Moore repeats and realleges each and every allegation contained in paragraphs 1 through 196 of this Complaint.

198.    Title VII prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on her race, color, and sex.

199.    Starting in early 2022, J&J initiated a campaign of discrimination against Moore in the terms and condition of her employment based on her race, color, and sex, which continued through her wrongful termination in January 2024, and is ongoing.

200.    Moreover, during this period, J&J created an intimidating, hostile, and offensive work environment for Moore, based on her race, color, and sex, through the discriminatory comments of its management, adverse actions, and practices.

201.    J&J also unlawfully retaliated against Moore for reporting and complaining of such discrimination and hostile work environment.

202.    These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of Title VII.

203.    J&J's conduct was malicious, wanton, and reckless or in willful disregard for Moore's rights.

204.    As a direct, proximate, and foreseeable cause of J&J's Title VII violations, Moore suffered humiliation, embarrassment, physical, mental, and emotional distress, damage to her reputation and economic opportunities, and loss of wages, other compensation, stock, benefits and retirement benefits.

205.     As a further proximate result of J&J's unlawful employment practices, Moore has had to incur attorneys' fees, costs, and incidental expenses.

206.     As a result of J&J's wrongful actions, Moore is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**AGAINST DEFENDANTS J&J, BROADHURST, AND REID**
**(Unlawful Employment Discrimination & Retaliation in Violation of NYSHRL)**

207.     Moore repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint.

208.     The NYSHRL prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on her race, color, and gender.

209.     Starting in early 2022, Defendants initiated a campaign of discrimination against Moore in the terms and condition of her employment based on her race, color, and gender, which continued through her wrongful termination in January 2024.

210.     Moreover, during this period, Defendants created an intimidating, hostile, and offensive work environment for Moore, based on her race, color, and gender, through discriminatory comments, adverse actions, and practices.

211.     Defendants also unlawfully retaliated against Moore for reporting and complaining of such discrimination and hostile work environment.

212.     These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of the NYSHRL.

213.     Defendants' conduct was malicious, wanton, and reckless or in willful disregard for Moore's rights.

214.     As a direct, proximate, and foreseeable cause of Defendants' NYSHRL violations,

Moore suffered humiliation, embarrassment, physical, mental, and emotional distress, damage to her reputation and economic opportunities, and loss of wages, other compensation, stock, benefits and retirement benefits.

215.    As a further proximate result of J&J's unlawful employment practices, Moore has had to incur attorneys' fees, costs, and incidental expenses.

216.    As a result of J&J's wrongful actions, Moore is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**AGAINST DEFENDANTS J&J, BROADHURST, AND REID**
**(Unlawful Employment Discrimination & Retaliation in Violation of NYCHRL)**

217.    Moore repeats and realleges each and every allegation contained in paragraphs 1 through 216 of this Complaint.

218.    The NYCHRL prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on her race, color, and gender.

219.    Starting in early 2022, Defendants initiated a campaign of discrimination against Moore in the terms and condition of her employment based on her race, color, and gender, which continued through her wrongful termination in January 2024.

220.    Moreover, during this period, Defendants created an intimidating, hostile, and offensive work environment for Moore, based on her race, color, and gender, through discriminatory comments, adverse actions, and practices.

221.    Defendants also unlawfully retaliated against Moore for reporting and complaining of such discrimination and hostile work environment.

222.    These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of the NYCHRL.

223.    Defendants' conduct was malicious, wanton, and reckless or in willful disregard for Moore's rights.

224.    As a direct, proximate, and foreseeable cause of Defendants' NYCHRL violations, Moore suffered humiliation, embarrassment, physical, mental, and emotional distress, damage to her reputation and economic opportunities, and loss of wages, other compensation, stock, benefits and retirement benefits.

225.    As a further proximate result of J&J's unlawful employment practices, Moore has had to incur attorneys' fees, costs, and incidental expenses.

226.    As a result of J&J's wrongful actions, Moore is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff Moore demands judgment against defendants Johnson & Johnson, Broadhurst, and Reid as follows:

a)    finding that Johnson & Johnson, Broadhurst, and Reid, as set forth herein, discriminated and retaliated against Moore in violation, as applicable respectively, of Title VII, the NYSHRL, and the NYCHRL;

b)    awarding Moore compensatory monetary damages under applicable law, in an amount to be determined at trial;

c)    awarding Moore punitive damages under applicable law, in an amount to be determined at trial;

d)    awarding Moore the costs of this action, together with reasonable attorneys' fees as provided under applicable law, in an amount to be determined at trial;

e)    awarding Moore pre-judgment and post-judgment interest as provided by law; and

f)    awarding Moore such other and further relief as the Court deems necessary and proper.

## **JURY DEMAND**

Plaintiff Moore hereby demands a trial by jury of all issues so triable.

Dated: New York, New York
      August 26, 2024

                          REAVIS PAGE JUMP LLP

By:   _____
                          Helen D. Reavis
                          Alice K. Jump
                          Gregory P. Feit
                          41 Madison Avenue, 41st Floor
                          New York, New York 10010
                          Tel.: (212) 763-4100
                          hreavis@rpjlaw.com
                          ajump@rpjlaw.com
                          gfeit@rpjlaw.com

                          *Attorneys for Plaintiff Lauren F. Moore*